E-FILING

ADR

JOHN M. PEEBLES (BAR NO. 237582)
MICHAEL A. ROBINSON (BAR NO. 214666)
PATRICIA R. LENZI (BAR NO. 160176)
DARCIE L. HOUCK (BAR NO. 196556)
**MONTEAU & PEEBLES LLP**
1001 Second Street
Sacramento, California 95814
Telephone:   (916) 441-2700
Facsimile:   (916) 441-2067
Email:   mrobinson@ndnlaw.com

Attorney for Plaintiff,
The Picayune Rancheria of the
Chukchansi Indians

# Filed

DEC 1 3 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

#99
FeesPd.
SI

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

The PICAYUNE RANCHERIA OF
CHUKCHANSI INDIANS, a federally
recognized Indian Tribe,

Plaintiff,

v.

The COUNTY OF MADERA, a political
subdivision of the State of California; The
BOARD OF SUPERVISORS OF THE
COUNTY OF MADERA; THOMAS P.
KIDWELL, County of Madera Tax Assessor;
TRACY DESMOND KENNEDY, County of
Madera Treasurer/Collector; RAYBURN
BEACH, County of Madera Planning
Director; The COUNTY OF MADERA
PLANNING DEPARTMENT,

Defendants.

Case No. **C 06 07613 RMW**

**COMPLAINT**

(Declaratory and Injunctive Relief) **PVT**

### NATURE OF ACTION

1.    Plaintiff brings this action for declaratory and injunctive relief to remedy

Defendants' repeated and continuing interference with and violations of Plaintiff's rights and

interests under federal law in and to the territory and lands of Plaintiff's Indian reservation, the

Picayune Rancheria.  Specifically, Plaintiff seeks to remedy Defendant's interference with and

violation of Plaintiff's right to exercise and quietly enjoy its rights of sovereignty and property

over, in and to certain Tribally-owned lands within the Rancheria, free from unlawful interference by the actions of Defendants. Plaintiff seeks declaratory relief declaring the respective rights of the parties with respect to such territory and lands, and seeks injunctive relief prohibiting Defendants from unlawfully attempting to assert and exercise governmental jurisdiction over such territory and lands through the imposition and enforcement of County regulatory and tax ordinances and regulations, including but not limited to County land use regulations and County *ad valorem* taxes, as well as certain environmental and regulatory laws of the State of California.

2.      The lands over which the Defendants have unlawfully attempted to assert and exercise governmental jurisdiction are Tribally-owned lands within the restored boundaries of the Picayune Rancheria. The lands were the subject of litigation in this Court, in *Hardwick, et al. v. United States, et al.*, No. C-79-1710 (N.D. Cal.) (Complaint filed July 10, 1979), in which this Court sought to remedy the unlawful termination and distribution of the lands located within the Picayune Rancheria pursuant to the California Rancheria Act, P.L. 85-671, *as amended.* As a remedy to the unlawful termination, this Court restored the boundaries of the Picayune Rancheria and declared the Rancheria lands to be Indian country and subject to all laws pertaining to federally recognized Indian reservations and Indian tribes. The County of Madera effectively seeks to undo this Court's remedial actions in that case by continually and repeatedly attempting to assert taxing and regulatory authority over the Picayune Rancheria. The County's repeated claims and assertions of jurisdiction exceed the County's authority under federal law, and contravene the provisions and purpose of the Stipulated Judgments this Court entered in 1983 and 1987 in *Hardwick v. United States*, (Stipulation for Entry of Judgment, entered Aug. 8, 1983) and (Stipulation for Entry of Judgment, entered May 28,

COMPLAINT – DECLARATORY AND INJUNCTIVE RELIEF

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

1987).  Moreover the County's attempts to regulate and tax the Tribe's reservation impermissibly infringes on the Tribe's sovereign rights, in violation of federal law.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1332, 1337, 1362, 2201 and 2202, as hereinafter more fully appears.

4.    This action arises under the Constitution and laws of the United States, including the following provisions: U.S. Const. Art. II, § 8, cl. 3 (Indian Commerce Clause); the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*; and federal common law.

5.    Venue is proper under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 84, and pursuant to the Stipulation for Entry of Judgment (Madera County) this Court entered on June 16, 1987, in *Tillie Hardwick, et al. v. United States of America, et al.*, No. C-79-1710 (N.D. Cal.) ("*Hardwick v. United States*"), and this Court's Order Denying the Tribe's Motion for Enforcement of Judgment, entered therein on December 7, 2006, 2006 WL 3533029.

## PARTIES

6.    Plaintiff, the Picayune Rancheria of Chukchansi Indians ("Tribe"), is a federally recognized Indian tribe.  70 Fed. Reg. 71194, 71196 (Nov. 25, 2005).  The Tribe has a sovereign interest in governing the Picayune Rancheria, the Tribe's federally recognized Indian reservation, and protecting the reservation from the improper enforcement of state and local laws in violation of the Stipulation for Entry of Judgment (Madera County) this Court entered on June 16, 1987, and other applicable federal laws.

7.    Defendant County of Madera ("County") is a political subdivision of the State of California.

8.    Defendant Board of Supervisors of the County of Madera is the legislative and executive governing body of County of Madera government.  The Board of Supervisors was a

named defendant in *Hardwick v. United States* and submitted to the Court the 1987 Stipulation for Entry of Judgment, in which the County agreed to remedy the effects of the unlawful termination of the Tribe and the Tribe's reservation by recognizing that the Picayune Rancheria was never lawfully terminated, restoring the boundaries of the Picayune Rancheria, and declaring all lands within the boundaries of the Picayune Rancheria to be "Indian Country" and subject to all federal laws applicable to Indian reservations and Indian tribes.

9.      Defendant Thomas P. Kidwell is the Madera County Tax Assessor.  The Tax Assessor was a named defendant in *Hardwick v. United States* and submitted to the Court the 1987 Stipulation for Entry of Judgment, in which the County agreed to remedy the effects of the unlawful termination of the Tribe and the Tribe's reservation by recognizing that the Picayune Rancheria was never lawfully terminated, restoring the boundaries of the Picayune Rancheria, and declaring all lands within the boundaries of the Picayune Rancheria to be "Indian Country" and subject to all federal laws applicable to Indian reservations and Indian tribes.

10.      Defendant Tracy Desmond Kennedy is the Madera County Treasurer/Tax Collector.  The Tax Collector was a named defendant in *Hardwick v. United States* and submitted to the Court the 1987 Stipulation for Entry of Judgment, in which the County agreed to remedy the effects of the unlawful termination of the Tribe and the Tribe's reservation by recognizing that the Picayune Rancheria  was never lawfully terminated, restoring the boundaries of the Picayune Rancheria, and declaring all lands within the boundaries of the Picayune Rancheria to be "Indian Country" and subject to all federal laws applicable to Indian reservations and Indian tribes.

11.     Defendant Rayburn Beach is the Planning Director for the County of Madera Planning Department.

12.     Defendant County of Madera Planning Department is the planning agency for the unincorporated area of Madera County and has primary responsibility for the enforcement of land use and construction regulations through the imposition of citations.

## GENERAL ALLEGATIONS

13.     From time immemorial, the Tribe has inhabited the western slope of the Sierra Nevada Mountains in an area roughly bordered by the Fresno River on the east, to the Finegold Creek on the west, and from the Coarsegold Creek on the south, to China Creek on the north. The Tribe's territory encompassed the present day locations of the towns Coarsegold and Oakhurst, California. The Tribe occupied this area in communities by residing in conical shaped structures 12 to 15 feet in diameter and roughly 12 to 15 feet in height. Tribal dwellings were situated 100 feet or more apart and spread over the entire area of the Tribe's traditional territory. Tribal members occupied the Tribe's territory communally sharing springs, bedrock, mortars, sweathouses, and swimming places.

14.     The social and political organization of the Tribe was based on paternal lineage. Under the Tribe's traditional political structure chiefs were preeminent among tribal officials. Traditionally the tribe had several chiefs with at least one in every tribal village. The executive powers of an individual chief were limited and no individual chief was paramount. Village chiefs' primary individual responsibilities included setting the date for events on the ceremonial calendar and as the representative of the Tribe in entertaining visitors and engaging in trade.

15.     Contact with European settlers greatly impacted the Tribe through disease and invasion of miners and explores entering the area during the California Gold Rush. By the

twentieth century the Tribe's population had been reduced to approximately twenty percent of its size prior to contact with outside cultures.  Nonetheless, despite the impact the foreigners had on the Chukchansi people, the Tribe has continually maintained a recognized community on the site of its current reservation near current day Coarsegold, California.

16.     On April 24, 1912, by Executive Order No. 1522, 3 C. Kappler, Indian Affairs: Laws and Treaties 675 (1913) ("Kappler"), the United States established a federally recognized Indian reservation for the Tribe on its ancestral lands, located near the current location of Coarsegold, California.   The Tribe's reservation, as established by Executive Order No. 1522, is known as the Picayune Rancheria, comprises 80 acres of land under federal protection for the exclusive use of the Tribe and its members, and is legally described as the North Half of the Northeast Quarter of Section 29, Township 8 South, Range 21 East, Mount Diablo Meridian, containing 80.0 acres, more or less.

17.     During the 1950's, due to pressure from non-Indians who desired to develop tribal land and resources, the United States pursued a policy of "Termination" in respect to Indian Tribes.  On August 1, 1953, Congress adopted House Concurrent Resolution 108 ) ("HCR 108"), H.R. Con. Res 108, 83d Cong., 1st Sess., 67 Stat. B132 (1953).  Although HCR 108 was merely a general policy statement it set the tone for the federal governments approach to Indian affairs during the 1950's and 1960's.  HCR 108 provided:

Whereas it is the policy of Congress, as rapidly as possible, to make the Indians within territorial limits of the United States subject to the same laws and entitle to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship, and

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

Whereas the Indians within the territorial limits of the United States should assume their full responsibilities as American citizens:  Now, therefore, be it *Resolved by the House of* Representatives *(the Senate concurring),* That it is declared to be the sense of Congress that, at the earliest possible time, all of the Indian tribes and the individual members thereof located within the states of California, Florida, New York and Texas, and all of the following named Indian tribes and individual members thereof, should be freed from Federal supervision and control and from all disabilities and limitations specially applicable to Indians[.]

After Congress passed HCR 108, the United States rapidly pursued the stated termination policy through specific legislative enactments.  Tribes strongly opposed termination, however, tribal consent was not considered necessary to the implementation of the termination policy.

18.    On August 18, 1958, as part of the United States' general termination policy, Congress enacted the California Rancheria Act ("Rancheria Act"), P.L. 85-671, 72 Stat. 619, *amended by* the Act of Aug. 1, 1964, P.L. 88-419, 78 Stat. 390.  Section 1 of the Rancheria Act provided that the assets of 41 named Rancherias (including the Picayune Rancheria) "shall be distributed in accordance with the provisions of this Act."  Section 2(a) of the Rancheria Act required that either the Indians of each Rancheria  or the Secretary of the United States Department of the Interior, after consultation with the Indians, prepare a distribution plan the United States Department of Interior prepare a distribution plan for each Rancheria.  Section 3 of the Rancheria Act required undertaking certain action with respect to each Rancheria **prior to** distributing the land pursuant to the distribution plans and removing them from trust status.  Section 3 of the Rancheria Act provided:

Sec. 3.  Before making the conveyances authorized by this Act on any rancheria or reservation, the Secretary of the Interior is directed:

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

(a) To cause surveys to be made of the exterior or interior boundaries of the lands to the extent that such surveys are necessary or appropriate for the conveyance of marketable and recordable titles to the lands.

(b) To complete any construction or improvement required to bring Indian Bureau roads serving the rancherias or reservations up to adequate standards comparable to standards for similar roads of the State or subdivision thereof. The Secretary is authorized to contract with the State of California or political subdivisions thereof for the construction or improvement of such roads and to expend under such contracts moneys appropriated by Congress for the Indian road system. When such roads are transferred to the State or local government the Secretary is authorized to convey rights-of-way for such roads, including any improvements thereon.

(c) To install or rehabilitate such irrigation or domestic water systems as he and the Indians affected agree, within a reasonable time, should be completed by the United States.

(d) To cancel all reimbursable indebtedness owing to the United States on account of unpaid construction, operation, and maintenance charges for water facilities on the reservation or rancheria.

(e) To exchange any lands within the rancheria or reservation that are held by the United States for the use of Indians which the Secretary and the Indians affected agree should be exchanged before the termination of the Federal trust for non-Indian lands and improvements of approximately equal value.

19.     Pursuant to the Rancheria Act, once the Secretary of the Interior had satisfied its duties under Section 3 and after the "plan for distribution of the assets of a rancheria or

reservation" was approved and the distribution plan was final, Section 10(b) of the Rancheria Act provided:

> the Indians who receive any part of such assets, and the dependant members of their immediate families who are not members of any other tribe or band of Indians, shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians all restrictions and tax exemptions applicable to trust or restricted land or interests therein owned by them are terminated, all statutes of the United States which affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner as they apply to other citizens or persons within their jurisdiction.

20.     On June 30, 1960, pursuant to Section 10(a) of the Rancheria Act, the Secretary of the Interior made effective a document entitled "A Plan For The Distribution Of The Assets Of The Picayune Rancheria" ("Distribution Plan").  Pursuant to the Distribution Plan, the Secretary of the Interior, intended to distribute the Tribe's roughly 80 acre reservation to three individual tribal members – Nancy Wyatt, Gordon Wyatt and Marianne Ramirez – and the dependant members of their immediate families.  Pursuant to Section 3 of the Rancheria Act, in exchange for their agreement to the Distribution Plan the Distribution Plan specifically provided that the three distributees specifically requested that the Bureau of Indian Affairs:

1.  Make interior and exterior surveys, such as are necessary, to convey merchantable and recordable title.

2.  Furnish each distributee with the approximate value of his or her parcel at the time of the conveyance.

3.  Develop springs on the rancheria and construct such water facilities as are necessary to provide domestic water for the distributees.

4.  Cancel all reimbursable indebtedness owing to the United States resulting from the development of water facilities.

5.  Construct a road on the rancheria, at the approximate location shown on the attached map, to minimum standards ordinarily required by Madera County for a road to be incorporated into its road system, provided arrangements can be made with the County to construct about one mile of road leading from State Highway 41 to the Rancheria.

6.  Convey to individual Indians according to this plan unrestricted title to lands constituting the Picayune Rancheria.  The attached sketch map indicates generally the location of lots to be conveyed.  Title will be subject to existing rights-of-way, easements or leased and will include such mineral and water rights as are now vested in the United States.

Pursuant to Section 3 of the Rancheria Act, the action the distributees requested the Bureau of Indian Affairs to take was mandatory and the Tribe could be terminated and Tribal assets could not be distributed and stripped of their protected trust status until such time as the United States satisfied these mandatory obligations.  Once satisfied the termination and distribution would be complete, title could be lawfully conveyed to the distributees, the United States' would no longer owe any fiduciary duty to the distributees and the distributees and the distributed land would no longer be exempt from any state and local laws, ordinances, or regulations.

21.    On January 18, 1962, pursuant to the Rancheria Act, the Bureau of Indian Affairs, issued a document entitled the "PICAYUNE RANCHERIA – Completion Statement"

MONTEAU & PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

1   ("Completion Statement"). The Completion Statement provided that the distribution plan was

2   approved pursuant to Sections 2(a) and 2(b) of the Rancheria Act, that the Secretary of

3   Interior had completed land surveys, cancelled all reimbursable indebtedness, and that the

4   distributes had received conveyance of the Tribe's assets.  The purpose of the completion

5   statement was to effectuate the Tribe's termination and officially record the distribution and

6   conveyance of the reservation lands to the three distributees identified in the Distribution

7   Plan.

8

9       22.     The immediate effect of the issuance of the Completion Statement and effecting

10   termination of the Tribe and distribution of the Picayune Rancheria was that:  1) the Tribe's

11   rolls were closed; 2) there were fundamental changes in land ownership as land passed from

12   the Tribe to individuals; 3) the trust relationship between the United States and the Tribe, and

13   the United States and the reservation lands was terminated; 4) state and local legislative

14   jurisdiction was imposed; 5) state judicial authority was imposed; 6) exemptions from state

15   and local taxing authority was ended; 7) federal programs to the Tribe and its individual

16   members was terminated; 8) tribal sovereignty and tribal jurisdictional prerogatives were

17   effectively, though not technically ended as elements of tribal sovereignty generally cannot be

18   practically implemented by tribes that do not have a land base over which to exercise

19   sovereignty.

20

21       23.     The long term effect of the termination under the Rancheria Act, in addition to

22   those effects set forth in paragraph 20, was that a significant portion of tribal lands in

23   California were transferred out of tribal and Indian ownership as non-Indians purchased the

24   land through direct purchases, or through foreclosure actions and tax sales.  In regard to the

25   Tribe specifically, the long term effect of the Rancheria Act was that nearly fifty percent (50%)

26   of the Tribe's land passed out of tribal and Indian ownership into non-Indian ownership.

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

COMPLAINT – DECLARATORY AND INJUNCTIVE RELIEF

Although tribal members maintained their connections to the Tribe and their land, the Tribe ceased to exist as a federally recognized sovereign entity, and lost its sovereign and jurisdictional authority over its ancestral and reservation lands.

24.     On July 10, 1979, in a case directly related to this action, a number of distributees from Rancherias that were terminated by the Rancheria Act brought suit against the United States and county tax assessors and collectors for counties where Rancheria lands were located. *Tillie Hardwick, et al. v. United States of America, et al.*, No. C-79-1710 (N.D. Cal.) (Complaint filed July 10, 1979) ("*Hardwick v. United States*" or "*Hardwick* litigation"). In the *Hardwick* litigation, the plaintiffs asserted that the United States violated the Rancheria Act in its efforts to rapidly terminate forty-one (41) Rancherias (including the Picayune Rancheria) under the Rancheria Act. Specifically, the plaintiffs asserted that the United States failed to properly inform the distributees of the legal effect of termination and that the distributees lands would be subject to state and local taxation and regulation and that the distributees would no longer have access to federal programs and protections. In addition, the plaintiffs in *Hardwick v. United States* asserted that the United States misrepresented to the distributees that termination was mandatory when in fact the Rancheria Act required the agreement of the distributees. Additionally, the plaintiffs asserted that the United States further violated the Rancheria Act because the United States did not satisfy its obligations under Section 3 of the Rancheria before terminating the tribes and distributing tribal lands and assets by conveying them to the distributees.

25.     The plaintiffs' purpose in the *Hardwick* litigation was to undo all of the effects of the unlawful application of the Rancheria Act and to fully restore the tribes and the tribal reservations to the status they held before the unlawful termination. Thus, the plaintiffs sought a declaration stating that:

MONTEAU &
PHEBUS, LLP
1001 SECOND ST.
SACRAMENTO, CA

1.     The tribes and the tribal reservations were not lawfully terminated;

2.     The Termination Proclamation of each of the subject Rancherias was unlawfully published and that the Secretary of the Interior was under an obligation to declare the notices to be unlawful and rescind them;

3.     The Secretary of the Interior was under a duty to "unterminate" each of the subject rancherias, and to offer to repurchase at fair market value the lands originally conveyed to Indian distributees that had passed into non-Indian ownership and to return all such lands to into trust for the benefit of the tribes;

4.     The United States had a duty to treat the restored Rancherias as Indian reservations in all respects and to afford the tribes and individual tribal members of the Rancherias all the rights and privileges and immunities ordinarily accorded to Indian tribes, bands and communities;

5.     That the subject Rancherias were to be treated as Indian reservations in all aspects;

6.     That all of the lands of the subject Rancherias were not subject to the jurisdiction of counties where the lands were situated, and further that the lands would not be subject to county regulation and taxation until such time as the lands were lawfully conveyed to individual distributees and removed from trust in full compliance with all of the provisions of the Rancheria Act.

The plaintiffs in *Hardwick* also sought to void the distribution plans, restore the federal governments trust obligations to the plaintiffs, to declare null and void the purported termination on of the Rancherias.

MONTREAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

13

26.     On January 31, 1986, the *Hardwick* Plaintiffs amended their complaint.  The amendment allowed a number of tribes that had reconstituted their formal federally recognized governments to intervene directly in the *Hardwick* litigation.  In addition, the amendment dropped as defendants, a number of counties that had voluntarily resolved their issues with the tribes located in the specific counties.  Finally, the amendment specifically named the County of Madera and the Madera County Tax Assessor as defendants to the *Hardwick* litigation.

27.     Both prior to and subsequent to the filing of the *Hardwick* litigation, which addressed the rights of the Tribe and sixteen other unlawfully terminated Indian tribes and their distributees, federal courts in California and the District of Columbia resolved disputes identical to those raised in the *Hardwick* litigation.   *See, e.g., Smith v. United States*, 515 F.Supp. 56 (N.D. Cal 1975); *Duncan v. Andrus*, 517 F.Supp 1 (N.D. Cal. 1977); *Duncan v. United States*, 667 F.2d 36 (Ct.Cl. 1981).  In those actions the courts ruled that the termination of Hopland Rancheria and the Pomo Indians of the Robinson Rancheria and their reservations were unlawful.  The courts further ruled that the Rancheria reservation lands were never lawfully subjected to state and local regulation.  The courts ordered the tribes and their reservations restored to the status they held immediately before the unlawful termination and directed that the reservation lands were to be treated as Indian country and subject to all of the privileges and protections that they were afforded under federal law prior to the unlawful termination.

28.     On July 15, 1983, with knowledge of the decisions rendered in *Smith v. United States*, 515 F.Supp. 56 (N.D. Cal 1975), and *Duncan v. Andrus*, 517 F.Supp 1 (N.D. Cal. 1977), and the pendancy of similar actions in *Duncan, et al.  v. United States*, No. 19-75 (Ct.Cl.), and Table *Bluff Band, et al. v. Andrus*, No. C-75-2525 (N.D. Cal.), the parties in the

*Hardwick* litigation entered into the first of two Stipulated Judgments. The Stipulation for Entry of Judgment, entered August 8, 1983 ("1983 Judgment"), restored the Tribe to its former tribal status by providing in paragraph 4 that:

> The Secretary of the Interior shall recognize the Indian Tribes, Bands, Communities or groups of the seventeen Rancherias listed in paragraph 1 as Indian entities with the same status as they possessed prior to the distribution of the assets of those Rancherias under the California Rancheria Act and said Tribes, Bands, Communities, or groups shall be included on the Bureau of Indian Affairs Federal Register list of recognized tribal entities pursuant to 25 C.F.R. section 83.6(b). Said Tribes, Bands, Communities, or groups shall be relieved of section 11 of the California Rancheria Act and shall be deemed entitled to any of the benefits or services provided or performed by the United States for Indian Tribes, Bands, Communities, or groups because of their status as Indian Tribes, Bands, Communities, or groups.

The Tribe was one of the seventeen Rancherias listed in paragraph 1 of the 1983 Judgment. Thus, by operation paragraph 4 of the 1983 Judgment the Tribe was restored to its prior status as a recognized sovereign Indian tribe with all of the sovereign rights it had prior to the unlawful actions of the United States in its implementation of the Rancheria Act.

29.     Restoration of tribal status and tribal sovereignty was not the only purpose of the plaintiffs in *Hardwick v. United States*, the plaintiffs also sought restoration of their former reservation to the same status and boundaries as they had prior the unlawful implementation of the California Rancheria Act. The 1983 Judgment did not address the issues related to restoration of the reservations and their boundaries.

30.     On May 28, 1987, the plaintiffs in the *Hardwick* litigation and the County of Madera submitted the second of the two stipulations for entry of judgment to Court. The

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

Stipulation for Entry of Judgment (Madera County), entered May 28, 1987 ("1987 Judgment"), addressed the unresolved issue pertaining to the restoration of the Picayune Rancheria, the Tribe's federally recognized Indian reservation.  Michael D. Ott, Counsel for Madera County, executed the 1987 Judgment on behalf of the County.

31.   Paragraph 1A defined the "PLAINTIFFS" of the 1987 Judgment as "all plaintiffs in the above-captioned case, the North Fork and the Picayune Rancherias, and all those class members from the North Fork and Picayune Rancherias."  Paragraph 1C defined the "Picayune Rancheria" as "all lands within the exterior boundaries of the . . . Picayune Rancheria as described in paragraph 2B.1."  Pursuant to Paragraph 2B.1 the lands of the Picayune Rancheria were described as 80 acres "located 3 miles south of Coarsegold, in Madera County, California.  N1/2NE1/4 Section 2, T. 8 S., R. 21 E. Mount Diablo Meridian." Thus, the 1987 Judgment defined the Tribe's reservation that President Taft established in 1912 for the sole use and benefit of the Tribe as a party to the 1987 Judgment.

32.   Paragraph 1B of the 1987 Judgment defined the "DEFENDANTS" as W.A. Neufeld/ Tax Collector for Madera County, Richard Gordon/ Assessor for Madera County and the Board of Supervisors for Madera County and their successors in office."

33.   In the 1987 Judgment the Court exercised its equitable powers to undo and to the fullest extent possible remedy the effects of the United States' unlawful acts and protect the Tribe and the Tribe's reservation from the perpetuation of harmful effects of the California Rancheria Act.  Therefore, the Court declared:

1.   The Picayune Rancheria was never lawfully terminated because the United States did not comply with Section 3 of the California Rancheria Act;

2.   The Courts intent was to remedy the effects of the "premature and unlawful" termination of the Picayune Rancheria;

MONTEAU &
PERKINS, LLP
1001 SECOND ST.
SACRAMENTO, CA

3.    The boundaries of the Picayune Rancheria were restored to the same location as they were prior to the premature and unlawful termination;

4.    That all land located within the Picayune Rancheria was restored to the same "Indian Country" status it held prior to the premature and unlawful termination.

5.    That the County of Madera and the United States shall from 1987 on, treat the Picayune Rancheria "as any other federally recognized Indian Reservation, and all of the laws of the United States that pertain to federally recognized Indian Tribes and Indians shall apply to the  . . . Picayune Rancheria[] . . .."

By taking these equitable and remedial steps the Court implicitly recognized and restored the Tribe's sovereign authority over the Picayune Rancheria and afforded the Picayune Rancheria, to the fullest extent it could, the same status and protections, including protection from state, or local taxation and regulation, that it had prior to being prematurely and unlawfully terminated by the United States.

34.    Although the Tribe's government never ceased to exist, even during the years in which the United States did not recognize the Tribe's sovereign status, the Tribe did not immediately establish a constitutional form of government after the 1983 Judgment directed the United States to recognize the Tribe's sovereign status.  The Tribe instituted a constitutional form of government on November 7, 1988, when it adopted the Constitution of the Picayune Rancheria ("Constitution").  The Preamble of the Constitution provides that its purpose is "to form a tribal organization to handle our Tribe's affairs, improve the economic conditions of ourselves and our posterity, promote our common welfare, and conserve and develop our land and other resources, encourage educational progress, and secure our powers of self-government."  The Constitution further provides that "[t]he jurisdiction of the Tribe shall extend to all lands comprising the Picayune Rancheria, as described in the

Stipulation for Entry of Judgment entered in *Hardwick, et al.*, N.D., Cal. No. C-79-1710-SW, notwithstanding the issuance of any patent, and to all lands hereafter acquired in any manner by the Tribe." Constitution Art. II.

35.     From even before the time the Tribe adopted its Constitution, a portion of the Tribe was always interested in developing the Tribe's economy through gaming related activities.  In part, the Tribe desired to establish a reliable source of tribal revenues so that the Tribe could acquire those portions of the Picayune Rancheria that had passed into the ownership and possession of non-Indians.  Initially, the Tribe intended to pursue this interest by establishing a bingo hall.  However, after the passage of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, the Tribe instead decided to supplement and develop the Tribe's economy and provide the Tribe with the ability to be autonomous and self-sufficient through more expansive Class III Indian gaming.

36.     In furtherance of its interest in pursuing gaming on its reservation lands, the Tribe adopted and submitted its first Tribal Gaming Ordinance to the National Indian Gaming Commission ("NIGC") for approval pursuant to IGRA.  The NIGC approved the Tribal Gaming Ordinance on June 27, 1996.  Section 1.2.1 of Title I of the Tribal Gaming Ordinance provides that one of its purposes is to "regulate, control, and oversee Gaming within the jurisdiction of the Tribe."  Section 7.1.1 of Title I of the Tribal Gaming Ordinance provides that the Tribe may operate Gaming Facilities "on those lands on which Gaming may be lawfully conducted under IGRA."   The Tribe subsequently submitted three amendments to the Tribal Gaming Ordinance to the NIGC for approval.  The NICG approved the respective amendments on December 3, 2001, February 15, 2002 and December 3, 2003.  The 2002 Amendment adopted by reference the same Uniform Building Codes adopted by reference by the U.S. Department of Housing and Urban Development, 24 C.F.R. § 200.925c, which included the

Uniform Building Code, National Standard Plumbing Code, National Electrical Code, and other relevant federal building and construction standards, as the standards to be employed to the development and construction of gaming facilities located within the Tribe's jurisdiction.

37.     In 1998, the Tribe's interest in developing the tribal economy through the operation of a Class III tribal gaming facility gained momentum as the Tribe secured the support of a development company that would assist the Tribe in the development of the Tribe's proposed Casino.  Therefore, the Tribe, as required by the IGRA, began negotiations with the State of California for a Tribal-State Gaming Compact to govern all gaming, gaming related, and casino related activities that the Tribe intended to undertake within the Tribe's reservation.  At this same time, through the assistance of its development company, the Tribe also began repurchasing all of the land located within the exterior boundaries of the Picayune Rancheria as restored in the 1987 Judgment.  The Tribe completed the purchases over the approximate period of 1986 to 2000.  Upon the purchase of the last parcel, all of the lands that the Tribe lost due to the unlawful and premature termination of the Picayune Rancheria were restored to Tribal ownership.

38.     On October 12, 1999, the Tribe and the State of California formerly entered into a Tribal-State Compact ("Compact").  The Compact set forth all the terms and conditions that the State of California required in relation to the development and construction of the Tribe's proposed gaming facility.  The Compact also set forth all the terms and conditions the State of California required in relation to the operation and expansion of the Tribe's proposed gaming facility after completion of construction.

39.     On March 2, 2000, in response to a inquiry concerning whether the restored lands within the Picayune Rancheria, to which the Tribe was forced to purchase in fee, due to the unlawful actions of the United States, needed to be placed in trust with the United States

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

COMPLAINT – DECLARATORY AND INJUNCTIVE RELIEF

1   prior to commencing gaming operations pursuant to the IGRA, the United States Solicitor's

2   Office recognized that the 1983 and 1987 Hardwick Judgments fully restored all lands located

3   within the Picayune Rancheria to the same Indian country status they had prior to the

4   unlawful and premature termination of the Picayune Rancheria.  Therefore, the Solicitor's

5   Office concluded that land did not need to be formally returned to trust status prior to the

6   development and operation of a tribal gaming facility on the restored reservation lands that

7   the Tribe held in fee.

8       40.      On May 5, 2000, the Assistant Secretary of the Interior approved the Tribe's

9   Tribal-State Compact.  65 Fed. Reg. 31189 (May 16, 2000) (Notice of approved Tribe-State

10   Compacts).  The Compact that the Assistant Secretary of the Interior approved, and to which

11   the State of California assented provided that the State was entering into the Compact "out of

12   respect for the sovereignty of the Tribe."  Preamble, Section D.  The Compact also states

13   among its listed purposes a desire "to terminate pending 'bad faith' litigation between the

14   Tribe and the State" and to "initiate a new era of tribal-state cooperation in areas of mutual

15   concern."  *Id.*  Furthermore, the Compact expressly notes that the Tribe intended "to develop

16   and operate a gaming facility offering Class III gaming activities on its reservation land, which

17   is located in Madera County of California."  *Id.,* Section C.  At all times relevant to the Tribe's

18   efforts to obtain approval of the Compact, the County was informed of the Tribe's intentions.

19   The County never objected to the Compact or the terms thereof.

20       41.      By letter dated December 3, 2001, in response to a California Department of

21   Justice ("DOJ") inquiry into "whether the Casino would be operated on a reservation[,]" the

22   NIGC responded that because the Tribe's gaming lands were located within its reservation

23   boundaries, the lands were "Indian lands" pursuant to 25 U.S.C. §2703(4)(A).

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

20

42. During the fall of 2001, the Tribe initiated development of the Chukchansi Gold Resort and Casino pre-construction activities pursuant to IGRA, the Compact and the National Environmental Protection Act, 42 U.S.C. § 4321 *et seq*. ("NEPA"). The United States Fish and Wildlife Department ("USFWD") provided a biological opinion dated April 2, 2001, as part of the process.

43. On April 20, 2001, the United States Environmental Protection Agency ("EPA") issued a Water Quality Certification concerning the Tribe's proposed gaming facilities. The EPA concluded that the Tribe had made appropriate efforts to avoid and minimize impacts to waters of the United States, as required by Section 404(b)(1) Guidelines. Despite full knowledge of the EPA's action, the County never objected to the issuance of the Water Quality Certification.

44. In December 2001, the Tribe issued its final NEPA Environmental Assessment ("EA"). As part of the process for the original project, the Tribe consulted with the Madera County Board of Supervisors on numerous occasions in addition to the County Planning Department, County Roads Department, and other county agencies, as well as Caltrans, the Regional Water Quality Board, State Office of Historic Preservation and the California Department of Fish and Game. The EA also acknowledged that the Tribe had provided the opportunity for public comment by members living within the vicinity of the proposed project. Finally, the EA documented the Tribe's consultation and coordination with various state and federal agencies, under various federal laws and the 1999 Tribal/State Compact. The County never filed any objection to the Tribe's EA and never asserted at any time that California State law should govern the environmental review for the project.

45. On February 19, 2002, NIGC Chairman, Montie R. Deer, issued a Notice of Finding of No Significant Impact ("FONSI") to the Proposed Picayune Rancheria Hotel and

MONTEAU &
PIEHLER, LLP
1001 SECOND ST.
SACRAMENTO, CA

Casino Project.  In the FONSI, Chairman Deer stated that all mitigation measures described in the EA were being implemented to reduce potentially significant adverse impacts to a point of insignificance, and were conditions of the approval of the project.  Chairman Deer also found that an Environmental Impact Statement was not required.  The County never opposed or otherwise objected to the issuance of the FONSI.

46.     On August 28, 2001, the Tribe and the County of Madera entered into a Memorandum of Understanding ("MOU") concerning its proposed gaming facility, agreeing to mitigation of certain off-reservation environmental impacts and payments for law enforcement, fire, police and other County services required to be provided to the Tribe under Public Law 83-280, 67 Stat. 588 (1953), *partially codified at* 18 U.S.C. § 1162 and 28 U.S.C. § 1360.

47.     On April 23, 2003, Madera County Supervisor for District 5 Gary Gilbert, in his official capacity, sent a letter to the Bureau of Indian Affairs, Elaina M. Doyle, offering his "personal support to the Picayune Rancheria of the Chukchansi Indians['] application to have [the 48.53 acres of land on the six parcels] ... accepted into trust by the United States of America."  His letter stated that the 48.53 acres were "within the boundaries of the Picayune Rancheria," and that the MOU with the County was "executed with the full knowledge of the legal opinion of Mr. Derrill B. Jordan" and that "these lands are 'Indian lands,' are within the Picayune Rancheria, and were restored pursuant to the Hardwick Stipulation."

48.     On January 29, 2004, the County filed a Motion to Enforce the 1987 Stipulated Judgment with the Picayune Rancheria land base in the United States District Court for the Northern District of California.  In its motion, the County alleged the Tribe refused to comply with the Stipulated Judgment for the placement of fee lands into trust with the United States

and in the absence of the lands placement into trust were required to and had not paid, *ad valorem* taxes as provided for in the settlement.

49.     On May 20, 2004, after hearing oral argument, the Northern District denied the County's Motion to Enforce, finding that: (1) the Picayune Rancheria tribal lands were a named plaintiff in the 1987 Stipulated Judgment; (2) the Court retained jurisdiction to resolve disputes arising under the 1987 Stipulated Judgment; (3) the Tribe was not a party to the 1987 Stipulated Judgment; (4) because the Tribe was not a party to the 1987 Stipulated Judgment its sovereign immunity against unconsented suit had not been unequivocally waived; (5) Madera County had not demonstrated that the Tribe had waived its sovereign immunity; and (6) the County was prohibited from collecting *ad valorem* taxes on lands acquired by the Tribe after 1987.

50.     On October 13, 2004, the Northern District denied the County's Motion for Reconsideration, again finding that the Tribe retained its sovereign immunity and the only lands subject to County *ad valorem* taxes under the 1987 Stipulated Judgment were lands the Tribe owned as of 1987.   The County never filed an appeal regarding this decision by the Honorable Judge Fogel.

51.     On October 25, 2004, Madera County filed an action for declaratory relief in the Madera County Superior Court, *Madera County vs. 48.53 Acres of Land*, No. MCV 025339. In its Complaint, the County alleged that certain lands owned by the Tribe in fee within the Picayune Rancheria had not been taken into trust by the United States.  The County further alleged the lands were subject to annual *ad valorem* taxes, under the California Constitution, Article XIII, Section 1, and the California Revenue and Taxation Code.  The County requested that the Court declare the Tribe's rights and duties with respect to the assessment and collection of *ad valorem* taxes until the lands were taken into trust by the United States.

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

COMPLAINT – DECLARATORY AND INJUNCTIVE RELIEF

52.     On April 13, 2006, the California State Board of Equalization ("CSBE"), after reviewing a plethora of legal documents issued by federal agencies and the County, issued its own opinion finding that under California Code of Regulations, Title 18, Section 1616(d)(2), the fee lands owned by the Tribe were, for assessment purposes, on a reservation within the meaning of regulation 1616(d)(2).

53.     Pursuant to the requirements under Section 10.8 of the Tribe's Compact, the Tribe publicly announced its intent to commence pre-construction project activities.  On May 4, 2006, consistent with the requirements of the Tribe's Environmental Policy Ordinance and section 10.8 of the Tribal /State Compact, the Tribe published and circulated its initial draft Off-Reservation Environmental Evaluation ("EE").  The draft EE was circulated for a 30-day public comment period, which ran from May 4, 2006, through June 2, 2006.  The draft EE was filed with the State Clearinghouse and State and local agencies, including the County of Madera.  During this period the Tribe received nine comment letters.  The draft EE analyzed the potential off-Reservation effects of the Tribe's proposed project and included the following: a project description, environmental setting, environmental analysis cumulative effects, growth inducement, mitigation measures and references.  On May 30, 2006, the Tribe held a public hearing where public comments were received.

54.     On June 9, 2006, the Tribe published and circulated its Final EE.  The Final EE was comprised of the draft EE with minor edits and the inclusion of public comments received subsequent to the circulation of the draft EE, and the Tribe's responses.  The draft EE included the following documents and reports; legal opinion from the NIGC, Off-Reservation Environmental Analysis Checklist, Biological Resources Report, Cultural Resources Report, Geotechnical Investigation, Phase I Environmental Assessment; Groundwater Conditions in

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

the Picayune Rancheria/Indian Lake Area/Hydrogeologic Evaluation of Chukchansi Casino Expansion and a Traffic Analysis.

55.    On June 2, 2006, the Tribe received a letter from Andrea Hoch, the Legal Affairs Secretary of the Office of the Governor.  Ms. Hoch's letter stated that the Governor's Office at that time had concerns that the Tribe's expansion project did not comply with CEQA requirements and that CEQA applied to the project.

56.    On June 12, 2006, the Tribe responded to Ms. Hoch's concerns in a lengthy and detailed description of the Tribe's evaluation, and its compliance with all applicable federal and Tribal statutes and ordinances.  The letter detailed the Tribe's basis for concluding that CEQA did not apply to this expansion.

57.    On September 8, 2006, Ms. Hoch replied to Chairwoman Jackson's letter stating that "the State has completed its review of the Draft Environmental Evaluation and does not plan to take any further action on the application of CEQA to the expansion project beyond the comments that were previously submitted to the Tribe."

58.    The environmental review that the Tribe conducted in relation to the expansion project strictly complies with the requirements of the Compact.  To this date, the State of California has never complained that it believes the Tribe has in any way violated the environmental review provisions of the Compact.

59.    The Tribe has fully complied with all provisions of the Compact, including Section 6.4.2(a)-(d).  These provisions set forth the Tribe's requirements for demonstrating protection of public health and safety, including building and safety standards.  To date, the State of California has never complained that it believes the Tribe in any way has violated the public health and safety standards set forth in the Compact.

60.     Subsequent to the circulation of the Final EE, the Tribe received comment letters from the State, County, local agencies and the local, non-Reservation, public.  The Tribe responded to each letter in compliance with the Compact and the Tribe's environmental ordinance.

61.     By letter dated September 1, 2006, the County Planning Director and County Counsel notified the Tribe that the County believes that the California Environmental Quality Act, Public Resource Code § 21000 *et seq.* ("CEQA") applies to the Tribe's casino expansion project on Tribally-owned lands within the Picayune Rancheria.  The County asserted that the Tribe was required to obtain permits from the County for the on-reservation construction project and that the County would not issue any permits for the project "without an appropriate environmental review, which may include an Environmental Impact Report" under CEQA.

62.     In a September 6, 2006, radio announcement on station KMJ (580AM), County Council David Prentice stated that the County will "red-tag" the Tribe's casino expansion project.

63.     In November, 2006, the Tribe commenced construction-related work on the Tribe's casino expansion project.

64.     On November 15, 2006, County officials entered the Picayune Rancheria and issued a "Stop Work" notice, directing the Tribe and its contractors to cease construction-related work on the Tribe's casino expansion project on Tribally-owned lands within the Picayune Rancheria, that lacked prior approval of the County Building Official.  No work on the project occurred that day.  On November 17, 2006, the County issued a Notice of Violation with respect to the same construction-related work.  After November 21, 2006, all such construction-related work has been redirected to Tribally-owned trust lands only.

65.     In response to the County's attempts to impede the legitimate work occurring on the Picayune Rancheria, on October 9, 2006, the Tribe filed a Motion to Enforce the 1987 Judgment in the United States District Court for the Northern District of California, in *Hardwick v. United States*, seeking to enforce the 1987 Judgment against the County and prevent the County's unwarranted attempt to impose state and local laws within the Tribe's sovereign territory of the Picayune Rancheria.  At a hearing held on December 1, 2006, the Honorable Judge Jeremy Fogel denied the Tribe's Motion to Enforce, while making it clear that his Court retained jurisdiction over the taxation and other issues arising from the 1983 and 1987 Judgments.  Judge Fogel reminded the Tribe that it was not party to the *Hardwick* litigation, but denied "the Tribe's motion for enforcement of judgment without prejudice to the Tribe's filing of a declaratory relief action."  Sip. Op., 2006 WL 3533029 at *4 (N.D. Cal. Dec. 7, 2006).  In the event that the Tribe should file such an action, Judge Fogel directed that the Tribe "shall file a notice of related case so that such declaratory relief action may be related to the instant action." *Id.*

### PRAYER FOR RELIEF

66.     WHEREFORE, the Tribe respectfully requests that this honorable Court grant relief as follows:

a.  a declaratory judgment, declaring that all rights and interests inuring to the Plaintiffs, as defined therein, by virtue of the Stipulation for Entry of Judgment (Madera County), entered by this Court on or about June 16, 1987, in *Tillie Hardwick, et al v. United States of America, et al.*, No. C-79-1710 (N.D. Cal.)(Stipulated Judgment filed June 16, 1987), with respect to the Picayune Rancheria, inure to and for the benefit and use of Plaintiff the Picayune Rancheria of the Chukchansi Indians;

b. a declaratory judgment, declaring that all lands within the exterior boundaries of the Picayune Rancheria, and now or hereafter owned by the Picayune Rancheria of Chukchansi Indians:

    i. are not subject to imposition and collection of *ad valorem* or any other taxation by the Defendants, and that the Defendants are without lawful right, power or authority to impose or collect *ad valorem* or any other taxes thereon, including but not limited to pursuant to Madera County Code, or any amendments or successors thereto;

    ii. are not subject land use, building and construction, environmental or any other regulation by the Defendants, and that the Defendants are without lawful right, power or authority to impose or enforce land use, construction, environmental or any other regulation thereon, including but not limited to the California Environmental Quality Act ("CEQA"), California Public Resources Code §§ 21000 *et seq.*, and Madera County Code §§ 1.12.080, 7.20.020, 7.20.027, 14.08.090, 14.50.030, and any and all amendments or successors thereto;

c. preliminary and permanent injunctions, prohibiting Defendants from:

    i. imposing, enforcing or collecting, or attempting to impose, enforce or collect, *ad valorem* or any other taxes with respect to any lands within the exterior boundaries of the Picayune Rancheria now or hereafter owned by the Picayune Rancheria of Chukchansi Indians;

    ii. prosecuting that certain action pending before the Superior Court of the State of California in and for Madera County, entitled *Madera County v. 48.53 Acres of Land*, No. MCV 025339 (Complaint filed Oct. 25, 2004), or

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.,
SACRAMENTO, CA

COMPLAINT – DECLARATORY AND INJUNCTIVE RELIEF

any other action seeking to impose enforce or collect, *ad valorem* or any

other taxes, including but not limited to pursuant to the Madera County

Code, and any and all amendments or successors thereto, on, against,

or with respect to any lands within the exterior boundaries of the

Picayune Rancheria now or hereafter owned by the Picayune Rancheria

of Chukchansi Indians;

iii.   imposing or enforcing, or attempting to impose or enforce, any land use,

building and construction, environmental or any other regulation,

including but not limited to pursuant to the California Environmental

Quality Act ("CEQA"), California Public Resources Code §§ 21000 *et*

*seq.*, and the Madera County Code, including any and all amendments or

successors thereto, on, against, or with respect to:  any lands within the

exterior boundaries of the Picayune Rancheria now or hereafter owned

by the Picayune Rancheria of Chukchansi Indians, any activities

conducted thereon by or on behalf of, the Picayune Rancheria of

Chukchansi Indians, its employees or agents;

d.   preliminary and permanent injunctions, compelling Defendants to promptly

execute a stipulation, and promptly take any and all other reasonable and

appropriate actions, to dismiss that certain action pending before the Superior

Court of the State of California in and for the County of Madera, entitled *The*

*Madera County  v. 48.53 Acres of Land*, No. MCV 025339 (Complaint filed Oct.

25, 2004);

/ / /

/ / /

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

e.  costs, fees and expenses, and reasonable attorneys' fees and expenses; and,

f.  such other further relief as this honorable Court may deem just and proper.

Dated:  December 12, 2006

Respectfully submitted,

MONTEAU & PEEBLES LLP
JOHN M. PEEBLES, ESQ.
MICHAEL A. ROBINSON, ESQ.
PATRICIA R. LENZI, ESQ.
Darcie L. Houck, ESQ.

By: _____
MICHAEL A. ROBINSON, ESQ.
Attorneys for Plaintiff,
The Picayune Rancheria of
Chukchansi Indians

COMPLAINT – DECLARATORY AND INJUNCTIVE RELIEF

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA